Matter of the Appraisal of the Estate of Charles Burhans, Deceased, Under the Acts in Relation to Taxable Transfers of Property.

(Surrogate's Court, Schoharie County, July, 1917.)

Transfer tax — what subject to — negotiable instruments — evidence — wills — legacy.

A testator by his note, which recited that it was given for value received, promised to pay his housekeeper $10,000 with interest from the date of his death on the express condition that she remain and continue to serve and act as his housekeeper until he died. He lived nearly twelve years after making the note and subsequently to its date devised to the payee certain real property and made her his residuary legatee. She remained and served as his housekeeper until the day of his death. *Held,* that the note was a valid debt and claim against testator's estate and the fact that it was made payable one year from the date of his death did not affect its validity.

That the amount of the note in the absence of proof to evade the statute was not subject to a transfer tax.

A clause in the will that the executor use and expend the amount of the note in payment thereof and in addition such an amount as would pay the interest accrued and due on the note at the time of its payment was not a legacy but a mere direction as to the debt created by the note; it neither made a transfer nor created a succession.

A creditor cannot be transformed into a legatee to the extent of his debt by a direction of his debtor's will that he be paid the debt.

PROCEEDINGS on report of transfer tax appraiser.

Charles H. Holmes, executor and in person.

William H. Golding, for Grace E. McNeil, creditor.

C. H. Proper, for State Comptroller.

BEEKMAN, S.   The report of the appraiser has been filed, and the attorneys have come in and asked to be heard on the question of whether a certain $10,000 note or agreement is taxable and have filed briefs and the executor and Grace E. McNeil have filed objections to taxation of said $10,000 note or agreement.

The appraiser's report under subdivision "Fourth" says, " I report that the decedent's estate is subject to the following deductions on account of debts, claims, expenses of administration and commissions as follows:

| Debt or claims of | Nature of same | Amount |
|---|---|---|
| Grace E. McNeil | Promissory Note | $10,000 |

(This claim has been presented to and allowed by Executor of decedent as a debt or claim against estate, a copy of such note and the facts in relation to its execution, etc., appear in the testimony annexed hereto, said note also being referred to and its payment directed in the 5th clause or paragraph of decedent's will also annexed)."

The appraiser's report further finds that the value of property or interest transferred to Grace E. McNeil is $7,881.49, of which $1,000 is exempt, leaving $6,881.49 as the amount taxable and this amount does not include the $10,000 payable by virtue of the note or agreement.

The appraiser in his report also says: " *Tenth.* I further report that the said deceased made no transfer of any property by deed, grant, bargain, sale or gift in contemplation of death or intended to take effect in possession or enjoyment at or after the death of said deceased, except that as to the question as to whether or not the $10,000.00 note or agreement is subject to or exempt from taxation this appraiser is unable to determine and by consent and agreement of all parties in Court appearing herein such question

is to be determined by this Court on application to determine and fix the tax legally chargeable against estate of said decedent.''

The '' note or agreement '' referred to reads as follows: '' $10,000:00. One year from the date of my death, for value received and the consideration hereinafter mentioned, I promise to pay Grace E. McNeil the sum of Ten Thousand Dollars with interest from the date of my death. This note is given and to be payable on the express condition that the said Grace E. McNeil remains and continues to serve and act as my housekeeper until the date of my death, otherwise to be of no force and effect.

'' Dated COBLESKILL, N. Y., *August 6th* 1904.
*Witness:* CHARLES H. HOLMES

CHARLES BURHANS.''

In the will of said Burhans dated and executed on January 31, 1906, he says: '' *Fifth.* I direct my said executor to use and expend Ten Thousand Dollars ($10,000.00) in the payment of a certain promissory note given by me to Grace E. McNeil above named, some time ago, and also in addition thereto such amount as will pay the interest accrued and due thereon at the time of such payment.''

The testator died February 21, 1916.

On June 12, 1916, a written claim was signed and sworn to by Grace E. McNeil for and on account of said note, the claim setting forth a copy of the note. The executor swears that such claim was filed with and was allowed by him as a debt against the estate.

There is a devise of real estate together with bequest of some specific personal property to Grace E. McNeil in the '' second '' subdivision of the will, and in the sixth and seventh subdivisions of the will bequests are given to friends, and he further bequeaths to his executor a certain sum in lieu of commissions

and makes Miss McNeil his residuary legatee. In considering the matter of the $10,000 item it seems to me that it must be treated the same as if the testator had not bequeathed to her the property specified in the second subdivision or made her a residuary legatee. In other words it is immaterial whether or not she was given testator's homestead lot and contents and made residuary legatee.

The main questions are whether the instrument dated August 6, 1904, was a valid obligation for a valuable consideration and whether she has asserted her claim thereunder.

The evidence shows that the instrument dated August 6, 1904, was executed by Charles Burhans some time after Miss McNeil went to work for him, and that it was delivered to the payee therein named; for a witness swears that Grace McNeil had the paper in her possession and showed it to the witness a short time after it bears date, and at or about the time of the death of deceased it was in a safe deposit box to which Miss McNeil had access inclosed in an envelope on which were the words, " Property of Grace E. McNeil " in her own handwriting.

There is proof that she remained and served as the housekeeper of Burhans until the day of his death.

From all the evidence, without reciting it in detail, it seems to me that the terms of the obligation were fulfilled by Miss McNeil and that it was a valid debt and claim against testator's estate, whether we call it a note, contract or agreement. The instrument recites " for value received," and, further, there is proof of services performed before its execution and the future services contemplated by the instrument were rendered. See *Hamilton v. Hamilton,* 127 App. Div. 874.

The fact that the $10,000 was made payable one year

after death does not affect the validity of the instrument by which it was made payable.

There is no proof that the instrument in question was made in contemplation of death within the meaning of the statute. *Matter of Baker,* 83 App Div. 530 and cases cited therein.

Furthermore: " The State has the burden of proving the facts under which the transfer tax may be imposed." *Matter of Miller,* 77 App. Div. 473–479, citing *Matter of Enston,* 113 N. Y. 117, 178, in which the court says: " The tax imposed by this act is not a common burden upon all the property or upon the People within the state. It is not a general but a special tax, reaching only to special cases and affecting only a special class of persons. · The executors in this case do not, therefore, in any proper sense, claim exemption from a general tax or a common burden. Their claim is that there is no law which imposes such a tax upon the property in their hands as executors * * * It is a well-established rule that a citizen cannot be subjected to special burdens without the clear warrant of the law. The following authorities furnish the true rule applicable to such a case: Cooley on Taxation (2nd Ed. 275), *United States* v. *Wiggleworth* (2 Story, 373), *Powers* v. *Barney* (5 Blatch., 203), *United States* v. *Watts* (1 Bond, 583), *Doe* v. *Snaith* (8 Bing. 152), *Green* v. *Halloway* (101 Mass. 248)." This decision was cited and reannounced in *Matter of Vassar* (127 N. Y. 1, 12), where it was said, "And the rule is that special laws are to be construed strictly against the government and favorable to the taxpayer, that a citizen cannot be subjected to special burdens without clear warrant of law." *Matter of Miller,* 77 App. Div. 473–479.

The same rule was laid down in *Matter of Thorne,* 44 App. Div. 8, where the court said: " The right to

impose the tax must rest upon evidence sufficient in probative force to bring it within the statute, and must establish a case from which the law clearly authorized its imposition.''

There is no evidence that the $10,000 obligation was executed with any intent to evade the transfer tax or to defraud the state. It is reasonable that Burhans should pay for the services of his housekeeper and that she should exact his written promise to pay for such services.

There is no proof that Burhans was in poor health when the instrument was executed. As a matter of fact, he lived for nearly twelve years thereafter, dying at the age of seventy, and the payee was bound to perform the services as housekeeper until the day of the obligor's death and run the risk of his leaving enough to pay his debts.

Subsequent to the date of the obligation, he made a will by which she was given real property and became residuary legatee. However, he might at any time have changed his will. For her services, she had to depend upon the instrument of August 6, 1904.

As to the adequacy of the consideration, and the reasonableness of the transaction, the language of the court in *Yarwood* v. *Trusts & Guarantee Co.*, 94 App. Div. 47, 52, is pertinent: '' Payment of a note given for $5,000 in consideration for services may not be resisted because it may seem to us that the price promised was larger than the value received. It is also to be borne in mind in this connection that the obligation was not payable until the death of the obligor, and that allowing a discount in its face value at the legal rate of interest, its cash value at the time it was delivered was less than half of its face amount.''

In this connection I desire to refer briefly to the language of the courts in the following cases: *Matter*

*of Miller,* 77 App. Div. 473, 481, in which the court says: " I do not consider that the statute has reference to transfers made upon a valuable consideration, but that it relates merely to voluntary transfers without consideration, for the tax is not one upon property, but upon the right of succession. (*Matter of Dows,* 167 N. Y. 227.) A payment of an obligation dependent upon a valuable consideration is not a succession in any sense."

Furthermore, as to debts the Court of Appeals said in *Matter of Westurn,* 152 N. Y. 100: " There can be no doubt, we think, that, in ascertaining the value of the estate of the decedent and the value of the taxable interests, debts owing by him are to be deducted. They are charges which *qualify the estate* and are first to be paid before there can be any distribution of the personal estate to legatees or next of kin. The real estate is liable also to be sold for the payment of debts when the personal estate is insufficient for that purpose. The tax imposed by the act is upon ' the transfer ' of property by will or by the intestate laws of the state * * *. Whether the transfer is by will or by operation of law, the real interest passing is what remains after payment of debts and other charges."

I have discussed the above matters somewhat at length as leading up to the main, if not practically the sole, contention of the state comptroller, that the case entitled *Matter of Gould,* 156 N. Y. 423, is decisive of this case, and makes the amount taxable against Grace E. McNeil, the sum of $16,881.49 instead of $6,881.49; in other words, that the $10,000 is taxable.

It seems to me that this case is clearly distinguishable from *Matter of Gould.* This case lacks several elements found in the *Gould* case and embraces governing elements not found in that case as the grounds of the decision in that case.

Referring to fifth subdivision of the Burhans will quoted herein above; as is frequently done by testators in order to obviate disputes after death as to the execution of some obligatory writing in testator's lifetime, or the uncertainty of the creation or validity of some debt or obligation which will be payable in course of administration of his estate, and in order to inform his executors of the situation of his affairs and debts, the testator in this case said: " I direct my executors to use and expend Ten Thousand Dollars ($10,000.00) in the payment of a certain promissory note given by me to Grace E. McNeil above named some time ago and also in addition thereto such amount as will pay the interest accrued and due thereon at the time of such payment."

This direction must be construed as if it expressly said: " I direct my executors to use and expend Ten Thousand Dollars in the payment of a certain promissory note given by me to Grace E. McNeil above named some time ago according to the terms and tenor thereof "— or " providing she complies with the terms thereof."

This fifth paragraph cannot be called a legacy, it was a direction as to a debt created according to the terms of a written instrument executed in his lifetime, and payable provided its terms were fulfilled. It made no transfer or created no succession.   See *Matter of Daniell,* 40 Misc. Rep. 329.

It cannot be assumed or presumed that he desired his executor to pay Miss McNeil $10,000 if she should cease to be his housekeeper before his death — if for instance, he should go on a year's journey leaving her in charge of his residence as housekeeper and she should abandon the place in his absence, or if, he falling seriously ill at home and remaining so for a long time, she should decline to remain longer in his serv-

ice as housekeeper when he might need her services most.

Upon his death the duty devolved upon his executor to satisfy himself that the payee of the note was legally entitled to payment. In this case we find a written obligation executed by the testator nearly one year and a half before the execution of a will, nearly twelve years before the death of the obligor, fixing the exact amount payable.

In the *Gould* will case it appears that George J. Gould at the age of about seventeen had a talk with his father, in which his father stated that he desired his son to devote himself entirely to his, the father's, business and to help him in his business wherever he could, and not to speculate or make any loans or do any other business on his own account, and George J. agreed to do as his father wished, and for about twelve years he devoted himself to his father's business.

From time to time George J. had received from his father large gifts of securities. He said he received them mostly about Christmas time. His father also gave him moneys monthly which George called an allowance and the father advanced to the son a check for $375,000, to pay for a house and stable. There was a conversation at about the time George received the check for the house and stable, in which George testified: "At the time he gave me the check for the house he told me he thought I had worked very faithfully for him and he asked me what I thought I ought to be compensated; I said I did not know, I felt a little delicacy about taking it up, and he asked me at that time if $500,000 a year would be satisfactory to me, and I told him it would." This conversation occurred about six or eight weeks before the death of the father, and as I understand this was the only time when any

specific amount of money was mentioned as compensation. Without discussing whether this conversation constituted a contract, it will be observed that *money* was evidently referred to and no payment in bonds or stock or any deduction of the $375,000 was mentioned.

About two or three weeks before his death Jay Gould prepared in his own handwriting and signed a paper of which the following is a copy (as I find the same in the printed record in the case on appeal):

### " EXECUTORS EXHIBIT ' A. '

" My beloved son George Gould having developed a remarkable business ability, and having for twelve years devoted himself entirely to my business, and during the past five years has taken entire charge of all my different interests, I hereby fix the value of such services at Five Million ($5,000,000) Dollars payable as follows:— Five Hundred ($500,000) Thousand Dollars, in cash, less amount advanced by me for purchase of his house and stable; ($500,000) Five Hundred Missouri six per cent. Consolidated Mortgage bonds; Five Hundred Thousand in Iron Mountain Consolidated five per cent. bonds; Five Hundred Thousand in Missouri Pacific Trust 5s.

" Ten thousand shares Manhattan Elevated Railway stock; Ten Thousand shares of the stock of the Western Union Tel. Co., and Ten Thousand shares of the stock of the Missouri Pacific Railway — all the foregoing bonds, cash & stocks to be treated as worth par; his receipt in full for the services mentioned will be all the voucher required.

" JAY GOULD."

This paper he delivered to his counsel, about two or three weeks before his death, to be incorporated in a proposed codicil to his will. His counsel testified:

" Mr. Gould remarked in substance this: that the most important of these changes was the one in favor of his son George as compensation for his services, and that he had signed that paper to the end that if he should die it would be binding upon him and asked me if it would, not be and I said yes, I did not see why it should not be and that is why he signed that paper &ast; &ast; &ast; . I think I have given the whole conversation now so far as it relates to the compensation of his son George for services and the execution of this paper which is all in his own hand writing." The witness further testified that George was not present at that conversation, and George had not been consulted about and did not see or have any knowledge of Exhibit "A" until after his father's death when it was shown him by his father's counsel.

A few days after Jay Gould gave the memorandum to his lawyer, the latter prepared the codicil of which the following is a copy:

" *Eighth* — My beloved son George J. Gould having developed a remarkable business ability, and having for twelve years devoted himself entirely to my business, and during the past five years taken entire charge of all my difficult interests, I hereby fix the value of his said services at five millions of Dollars ($5,000,000) payable as follows: Five Hundred Thousand ($500,000) in cash, less the amounts advanced by me for the purchase of a house for him on Fifth Avenue, New York City, and such amount as I shall hereafter advance to purchase stables; five hundred thousaid dollars ($500,000) in Missouri Pacific Railway Co. six (6) per cent. 1937 consolidated mortgage bonds; five hundred thousand dollars ($500,000 )in St. Louis, Iron Mountain & Southern Railway Co. consolidated five (5) per cent bonds; five hundred thousand dollars ($500,000) in Missouri Pacific Railway Co. Trust (5)

per cent bonds; ten thousand (10,000) shares of the stock of the Manhattan Elevated Railway Company; ten thousand (10,000) shares of the stock of the Western Union Telegraph Company, and ten thousand (10,000) shares of the stock of the Missouri Railway Company,— all the foregoing bonds and stock to be treated as worth par; and the receipt of the said George J. Gould in full for the said services *and all other services down to the time of my death not otherwise paid for by me during my lifetime, unless I shall hereafter by a different testamentary provision provide,* shall be all the voucher required by my executors and trustees.''

The words italicized are not in the memorandum which Jay Gould prepared and are very material changes especially the words '' services down to death '' and the words '' unless I shall by a different testamentary provision provide.''

What was the arrangement then, if any, between Gould and his son? We have the indefinite talk about $500,000 per year without stating for how many years; next the memorandum Exhibit ''A'' which refers to the '' past services,'' and does not mention '' services down to time of my death '' or reserve the right to thereafter provide otherwise by '' different testamentary provision; '' third, we have paragraph '' eight '' of the codicil, which the son agreed to and under which he took the stock and bonds.

The decision of the Court of Appeals turns upon what took place beginning with the time when Jay Gould a week before his death submitted his will and codicil to his son and asked him whether the provision (the eighth article of the codicil) in which he had made provision for him was satisfactory to him and the son said it was. The Court of Appeals says: '' It should further be observed that George J. Gould con-

sented to accept payment for his services under this provision '' (156 N. Y. 426), and then quotes the conversation between father and son when the eighth paragraph of the codicil was read by the son in the presence of his father: '' He was sick in bed, and he told me where his will was and told me to go and get it, and when I had gotten it, he asked me to open the envelope and read it through, which I did; then he asked me if I understood it; I said I did, and then he asked me whether this provision which he had made — the one I have just read [8th Article of the second Codicil] was satisfactory to me; I told him it was.

'' He could have refused compensation in this manner, and had he done so whatever sum he might have recovered against the estate under the agreement with his father would not have been taxable under the Taxable Transfer Act, for there would have been in such case no transfer by will.  This he did not do; but instead *elected* to *accept* a transfer of a certain amount of money, bonds and stock under the will in compensation for his services, and the question is, is the money and property thus transferred taxable?''

An examination of the record on appeal in the *Gould* case shows that the counsel for the comptroller, as a basis of their contention that the legacy to George J. was taxable, urged upon the attention of the court that in the list of creditors George J. Gould's name was not mentioned; that he never formally proved a debt against the estate, but merely received the benefit provided in the codicil; that he accepted it as it was written, and that he never proved a debt or claimed to be a creditor until the transfer tax proceedings, and the Court of Appeals said, as above quoted, '' that he elected to accept a transfer of a certain amount of money, bonds and stock under the will in compensation for his services.''

On the theory of George Gould having a legal claim for services at the rate of $500,000 per year his claim or recovery would have been in money, not in stock and bonds whose value was arbitrarily fixed.

When he elected to accept a transfer of a small amount of money, and the balance in stock and bonds, he took under and by virtue of the will; he did not assert any claim for services against the estate, hence the significant words in the opinion of the Court of Appeals: " Was not the property mentioned in this codicil transferred by will? Certainly it was, for the title to the bonds and stocks described in the codicil was taken away from the estate of Jay Gould and vested in George J. Gould under and by virtue of the second codicil and such property is therefore taxable under the express provisions of this statute." In other words, George J. did not take that property by virtue of any claim but by virtue of the will.

Whether the evidence in the *Gould* case showed a liquidated claim, it is not necessary to discuss here. The decision in the *Gould* case should not be extended to cover circumstances which do not embrace the essential elements upon which it is founded. The *Gould* case presents an unusual combination of circumstances, and the decision is based on the fact that the son did not assert his claim for payment but elected to take the *specific* property bequeathed by the will.

The court says (p. 428): " That the son agreed to accept the transfer of the property to him by that method, appears by his testimony that he stated to his father that the provision for compensation was satisfactory, and that he accepted the benefit of this provision is unquestioned."

In the case at bar there is a valid obligation for a good and valuable consideration, executed by the

obligor naming the exact amount the obligee is entitled to receive. There is no proof of any conversation or agreement with the testator to receive payment by will, nor any proof of any knowledge by Miss McNeil during the lifetime of the testator of the provisions of the will. Nor is there any proof that she has accepted or agreed to the provisions of the will as to the payment of her claim. On the contrary, there is proof that she presented her claim by virtue of the note in question and that the executor allowed it as a debt.

If the testator had bequeathed her a farm or specified bonds and mortgages in payment of her claim, and she had elected to accept them, under the doctrine laid down in *Matter of Gould,* she would be taxable.

It cannot be the law and the Court of Appeals has not declared in the *Gould* case that a testator can, by mentioning a debt in a will and directing his executor to pay it, impose a transfer tax upon the amount due the creditor, without the creditor's consent, and thereby cause the creditor to suffer the loss of five per cent of his claim.

Suppose Burhans had owed John Doe a note for $10,000 borrowed money and had said in his will: " I direct my executor to use and expend ten thousand dollars in the payment of a certain promissory note given by me to John Doe and also such amount as will pay the interest accrued at time of payment," and after the probate of the will John Doe presents his claim and the executor allows the claim and the due execution and delivery of the note are proved and there is no proof of prior payment, will any one claim that John Doe is taxable under the Transfer Tax Law?

Suppose Burhans had made a contract to purchase certain real estate and owed a balance thereon and by will had directed his executor to pay the unpaid

balance to the vendor and the vendor had made a claim upon the estate therefor, will any one claim that the vendor is taxable under this act? The creditor is not bound to begin suit and prosecute it to judgment in order to show that he makes claim by virtue of his debt and does not elect to take under the will as a legatee.

A creditor cannot be transformed into a legatee to the extent of his debt by the direction of a testator in his will that he shall be paid.

The $10,000 in question is not taxable herein. The amount transferred to Grace E. McNeil is $7,881.49, of which $1,000 is exempt, leaving $6,881.49 taxable at five per centum.

The legacies bequeathed to other persons, not amounting to $1,000, are not taxable.

Decreed accordingly.